IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MAURICE R. CARVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04 C 3324 |
| | ) | |
| NORMAN Y. MINETA, | ) | HONORABLE CHARLES R. NORGLE |
| Secretary, Department of Transportation, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court is Defendant's Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the court grants Defendant's Motion for Summary Judgment.

**I. BACKGROUND[1]**

**A. Facts**

*1. The Parties*

This case arises out of Plaintiff Maurice R. Carver's failure to re-obtain employment as an air traffic controller at the Department of Transportation's Chicago Center in 2002. Between 1972 and 1981, Plaintiff Maurice R. Carver ("Carver") worked as an air traffic controller for the Federal Aviation Administration ("FAA"), an agency within the Department of Transportation

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and notes disputed facts within the text.

1

("DOT"). Carver was fired on August 3, 1981 after he and 11,000 other FAA air traffic controllers who were at the time members of the Professional Air Traffic Controllers ("PATCO") union engaged in an illegal strike against the federal government. President Reagan banned these individuals, including Carver, from future employment as FAA air traffic controllers.

Then, in 1993, President Clinton lifted President Reagan's ban, and the FAA issued recruitment notice No. 93-01 for ex-controllers to reapply. The FAA stated that ex-PATCO controllers were not guaranteed employment, would not receive preferential treatment, and must meet the same qualifications as other applicants. The FAA delegated the hiring authority of ex-PATCO personnel, to the Aviation Careers Division in Oklahoma City, Oklahoma. The Oklahoma City office issued referral lists of ex-PATCO applicants to regional hiring officials. In November 1993, the FAA received Carver's application for an air traffic controller's position.

In 2002, the FAA divided the country into nine regions for purposes of air traffic control. Each region was allowed to utilize its own hiring system. In order to fill vacancies, the FAA looks to different sources, including: (1) the list of qualified individuals who have taken the Office of Personnel Management's civil service exam; (2) graduates of the Air Traffic-Collegiate Training Initiative ("CTI"); (3) graduates of the Mid-America Resource Consortium ("MARC"); (4) former members of the PATCO union who were fired in 1981; (5) Veterans Readjustment Act ("VRA") appointments; (6) Department of Defense civilian employees; (7) former FAA controllers eligible for reinstatement; and (8) certain retired military air traffic controllers. Each region was permitted to fill a vacancy using any of these resources.

## *2. Air Traffic Controllers*[2]

The air traffic control system in the United States is a vast network of people and equipment that ensures the safe operation of commercial and private aircraft. Specifically, air traffic controllers coordinate aircraft traffic so that planes travel a safe distance apart from one another. The primary concern of any air traffic controller is safety. Controllers are also required to direct planes in the most efficient manner, to minimize delays and regulate traffic. While airport tower controllers watch over planes that travel through airport airspace, the controller's main responsibility is to organize the flow of aircraft in and out of the airport. In order to achieve this goal, air traffic controllers rely heavily on radar and visual observations.

During arrival and departure, several controllers direct each plane. If the path to the airport is clear, the controller directs the pilot to the runway. If the airport is congested, the controller directs the pilot into a traffic pattern with other aircraft waiting to land. Once the plane lands, a ground controller in the tower directs the aircraft along the taxiways to the assigned gate.

After planes depart, airport tower controllers hand off their responsibilities to "en route" controllers. En route controllers work in three member teams. For example, a team might be responsible for all planes that are between 30 and 100 miles north of an airport and flying at an altitude between 6,000 and 18,000 feet. In order to prepare a plane to enter a team's airspace, the radar associate controller organizes flight plans from a computer printout. If two planes are scheduled to enter the team's airspace simultaneously, the radar controller may arrange with the preceding control unit for one plane to change its flight path. The preceding control unit can be

---

[2]The facts from this section are taken from the U.S. Department of Labor Occupational Outlook Handbook, 2006-2007 Edition. See http://www.bls.gov/oco (visited May 4, 2006).

another team at the same or adjacent center, or a departure controller at a neighboring terminal. The radar controller observes the planes in the team's airspace and communicates with pilots when needed. Radar controllers direct planes as to avoid collisions and congestion in the nation's skies, and advise pilots of turbulence, weather hazards, and jet streams.

Both airport tower and en route controllers are typically responsible for several planes at once. At times, controllers must make quick decisions about unrelated activities. A controller might have to direct a plane on its landing approach, and at the same time provide pilots who enter the airport's airspace with weather information. While handling these issues, the controller might also be responsible for any number of planes in a holding pattern due to aircraft traffic.

In order to become an air traffic controller, an individual must enroll in an FAA approved education program and pass a pre-employment test that measures his or her ability to serve as a controller. In addition to the pre-employment test, applicants must have three years of full-time work experience, completed four years of college, or a combination of both. The FAA considers one year of undergraduate study equivalent to nine months of work experience. Exceptions are made for those, such as Carver, who have prior experience and are veterans. Once the applicant successfully completes the FAA-approved program, those who meet the basic qualifications and requirements (including being younger than 31 years of age), are eligible for employment as an air traffic controller. Applicants must pass a medical exam, undergo drug testing, and obtain security clearance prior to employment. Once a controller is employed in one of the nine nationwide regions, he or she must undergo an annual medical exam, random drug screening, and a biannual job performance examination.

Recently, the FAA has implemented an automated air traffic control system called the

National Airspace System ("NAS"). According to the FAA, the NAS is a long-term strategic plan that will allow controllers to more efficiently deal with increased air traffic. The NAS is intended to replace aging equipment and to introduce new systems, technologies, and procedures to enhance safety and security and support growth in the aviation industry.

### 3. Carver's 2002 employment application at Chicago Center

The Chicago Center is located in the Great Lakes region. Chicago Center is an FAA 'en route' air traffic control facility in Illinois, In 2002, Joyce Brand ("Brand") hired air traffic controllers at the regional level. Brand consulted with William Cound ("Cound"), Chicago Center's air traffic manager, as to which hiring pools he preferred to utilize.

Cound believed several factors correlated to a new controller's prospects for success. Such factors included: (1) previous air traffic training or experience; (2) previous radar experience; and (3) recency of air traffic experience. According to Cound, training is a significant issue at Chicago Center, because it takes a new controller an average of four years to reach full certification. Based on his personal experience of controller performance, and feedback from his staff, Cound felt that the VRA applicant pool was the preferred source from which to fill vacancies at Chicago Center. VRA applicants consisted of eligible military air traffic controllers who possessed current radar experience that is closely related to the work performed at the Great Lakes region. Prior to 2002, Chicago Center hired several controllers from the VRA pool. According to Cound, Chicago Center had yet to have a VRA controller fail the required training program. In 2002, the FAA filled eleven of its twenty-three controller position vacancies at Chicago Center with VRA applicants. Nine of the VRA applicants selected were male.

5

Additionally, between 1996 and 2000, Chicago Center hired a total of twenty-one controllers from the ex-PATCO applicant pool. Carver was not one of the ex-controller selected for reappointment. Cound believed that ex-PATCO applicants hired at Chicago Center had been less successful in their training compared to new controllers hired from the VRA, MARC, or CTI pools. In 2002, there were no ex-PATCO referral lists generated for the Chicago Center. The only ex-PATCO referral lists issued for Chicago Center were in 1996, 1997, and 1998. During the 2002 calender year, Carver was not selected for employment as an air traffic controller. Cound claims that he did not discuss or consider the age of ex-PATCO applicants, either individually, or as a group. He further claims that the age of ex-PATCO applicants played no part in his decision to select VRA applicants over ex-PATCO applicants. Cound claims this was due to the fact that no ex-PATCO referral lists were issued to the Great Lakes region in 2002. According to Carver, January 15, 2003 was the date when the most recent discriminatory action occurred.

## B. Procedural History

On September 6, 2001, almost eight years after Carver reapplied for an air traffic controller's position, he filed a complaint with the FAA's Equal Employment Opportunity office ("EEO") alleging discrimination based on age and gender when he was not selected for a position at an FAA facility in Minneapolis, Minnesota in 1998. On October 10, 2001, the FAA dismissed Carver's claims for failure to contact an EEO counselor within 45 days of the allegedly discriminatory acts. On October 15, 2004, the EEOC upheld the agency's decision.

On March 4, 2003, Carver filed a second complaint with the FAA, alleged that in December 2002, he learned that younger female, and less qualified individuals were hired at

Chicago Center in 2000, 2001, and 2002. On March 13, 2003, the FAA notified Carver that his EEO complaint had been accepted for investigation. Additionally, the FAA informed Carver that he must respond within five calender days of receipt of the EEO letter of he believed a correction was necessary to the claim. Carver never replied to the March 13 letter. Then, on February 11, 2004 the FAA issued its final agency decision, finding that Carver as not discriminated against on basis of age or gender when he was not hired at Chicago Center in 2002.

On January 15, 2005, with the current action pending, Carver filed Complaint No. 05-C-256 in the Northern District of Illinois, alleging discrimination based on age and gender when he was not re-hired at facilities in Illinois, Indiana, and Minnesota, prior to 2002. On August 17, 2005, the court granted DOT's Motion to Dismiss based on Carver's failure to exhaust his administrative remedies. See Case No. 05-C-256, Minute Order of August 17, 2005.

On May 11, 2004, Carver filed this current action in the Northern District of Illinois, alleging that the DOT discriminated against him based on age and gender as a result of its decision to not hire him in 2002. Then, on January 31, 2006, the DOT filed its Motion for Summary Judgment. Carver filed his Response on March 6, 2006, and the DOT Replied on March 24, 2006. The DOT's Motion for Summary Judgment in the pending case is now fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Velez v. City of Chicago, 442 F.3d 1043, 1047 (7th Cir. 2006). The nonmoving party cannot rest on

the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002). A motion for summary judgment is granted "if no reasonable jury could find for the non-moving party." Raymond v. Ameritech Corp., 442 F.3d 600, 608 (7th Cir. 2006).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard,

"[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d. 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

## B. Carver's Gender Discrimination Claim

### 1. Title VII- 42 U.S.C. § 2000e

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see Whittaker v. Northern Illinois University, 424 F.3d 640, 645 (7th Cir. 2005). In order to prevail on a gender discrimination claim under Title VII, Carver must "either show direct evidence of discriminatory motive or intent, or rely on the indirect burden-shifting method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Bio v. Federal Express Corp., 424 F.3d 593, 596 (7th Cir. 2005).

Under the McDonnell Douglas method, a plaintiff who alleges gender discrimination must establish four elements: (1) that he is a member of a protected class; (2) that he applied for, and was qualified for an open position; (3) that the employer rejected him from that position; and (4) the employer filled that position with an individual outside of the plaintiff's protected class, or the position remained vacant. Gore v. Indiana Univ., 416 F.3d 590, 592 (7th Cir. 2005); Ballance v. City of Springfield, 424 F.3d 614, 617 (7th Cir. 2005).

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate, non discriminatory reason for the decision. Id. at 617. If the defendant satisfies its burden, the burden shifts back to the plaintiff to show that the defendant's

9

explanation was pretextual. Id; Bio, 424 F.3d at 596. To establish pretext, the plaintiff must show that the reasons given by the employer are factually baseless, were not the actual motivation for the decision, or were insufficient to motivate the decision. Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000). The failure to establish any one of the initial four elements defeats a plaintiff's discrimination claim. Id. With these principles in mind, we turn to Carver's claims.

### 2. Carver has not established a prima facie case of gender discrimination

Carver has not presented the court with any evidence of direct discrimination. "Direct evidence is evidence which in and of itself suggests that someone with managerial authority was 'animated by an illegal employment criterion.'" Walker v. Bd. of Regents of the Univ. of Wisconsin, 410 F.3d 387, 394 (7th Cir. 2005) (quoting Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999)). Such evidence is typically related to "the motivation of the decision maker responsible for the contested decision." Id. This evidence can be "interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." Id. (quoting Troupe v. May Dept. Stores, 20 F.3d 734, 736 (7th Cir. 1994)). "Direct evidence of discrimination would amount to an admission by [DOT] that [Carver] was [not hired] on the basis of age ore gender." Raymond, 442 F.3d at 610. Here, Carver has provided no documents, statements, or other materials that would give rise to any direct evidence of discrimination. Therefore, he must proceed under the McDonnell Douglas burden shifting method.

As a preliminary matter, it is undisputed that Carver applied for and was qualified for an open position, that he was rejected from that position, and that the position which Carver sought was filled. Therefore, the only dispute is whether or not Carver is a member of a protected class.

Because Carver alleges he was discriminated against because he is male, "the conventional McDonnell Douglas framework is not very helpful for so-called reverse-discrimination cases." Gore, 416 F.3d at 592. A male plaintiff "alleging gender discrimination must show something more than the fact that he is gendered." Mlynczak v. Bodman, 442 F.3d 1050, 1057 (7th Cir. 2006) (quoting Gore, 416 F.3d at 592). As a result, "the first prong of the McDonnell Douglas test cannot be used." Gore, 416 F.3d at 592. Instead, Carver must show "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites [or men] or evidence that there is something 'fishy' about the facts at hand." Id. (citing Phelan v. City of Chicago, 347 F.3d 679, 684 (7th Cir. 2003)).

Here, Carver presents no evidence to show that Cound, Brand, or anyone at Chicago Center had a reason to discriminate against men. In fact, of the twenty-three controller vacancies filled at Chicago Center in 2002, twenty were filled by males. See Def.'s Stmt. of Mat. Facts, ¶ 45. This fact is most devastating to Carver's claim. No reasonable jury could conclude that the DOT had "reason or inclination to discriminate against men" when all but three of the controller positions were filled by males. See Gore, 416 F.3d at 592; Raymond, 442 F.3d at 608 (summary judgment is proper if no reasonable jury could find for the nonmoving party).

As a result, the evidence in the record demonstrates that Cound and Brand sought after the most qualified and able applicants to fill the controller positions for Chicago Center in 2002. There is no evidence to suggest that either Cound or Brand selected applicants from the VRA or MARC pools in an attempt to discriminate against men. They simply chose those applicants who they believed, based on experience, would be best suited to work as air traffic controllers. In fact, Cound stated that he never requested a list of the ex-PATCO applicants when he filled the

vacancies at Chicago Center in 2002. Therefore, he could not have discriminated against Carver because Cound was never aware that Carver was in the pool of applicants. "There is nothing to suggest discrimination in an employer's bending the rules to give the better job or the higher salary to the more qualified applicant. That is just good management." Walker v. Abbot Laboratories, 416 F.3d 641, 644 (7th Cir. 2005).

As a result, Carver is unable to establish a genuine issue of material fact on the first prong of his gender discrimination claim. He has submitted no evidence, either direct or indirect, that the DOT was inclined to discriminate against him based on his gender. Therefore, summary judgment is proper in favor of the DOT as to Carver's gender discrimination claim.

### 3. Legitimate Reason for DOT's Action

Even though Carver has not established a prima facie case for gender discrimination under Title VII, with an abundance of caution, the court will proceed with the remaining McDonnell Douglas analysis. Assuming, arguendo, that Carver has established a prima facie case of gender discrimination, the burden shifts back to the DOT to establish a legitimate, non-discriminatory reason for its decision not to hire Carver. See Gore, 416 F.3d at 592; Ballance, 424 F.3d at 617. "An employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Rudin v. Lincoln Land Comm. Coll., 420 F.3d 712, 725 (7th Cir. 2005) (quoting Stockett v. Muncie Indiana Transit Sys., 221 F.3d 997, 1001 (7th Cir. 2000)).

Here, Brand and Cound have stated that they hired primarily from the VRA, MARC, and CTI pools of applicants, because applicants from these lists were the most successful air traffic

12

controllers. There is no evidence in the record that suggests the DOT had a discriminatory motive when it chose twenty males, and three females over Carver at the Chicago Center in 2002.

Moreover, Carver admits that he has had no air traffic control experience since he was fired in 1981. For the past twenty years, he has been working as a handyman in Kentucky. The applicants hired for air traffic controller positions in Chicago Center in 2002 had previous radar, military air traffic control, and other training experience. These applicants were more knowledgeable on the current technologies implemented by the FAA, and had more experience than Carver within the past twenty years. See Abbot Laboratories, 416 F.3d at 644 ("A plaintiff cannot be permitted to manufacture a case merely by showing that the employer does not follow its employment rules with Prussian rigidity.").

As a result, the DOT has established a legitimate, non-discriminatory reason for its decision to hire air traffic controllers from the VRA, MARC, and CIT pool, rather than Carver.

*4. Pretext Argument*

Lastly, after the DOT has established its legitimate reason for its action, Carver is required to show that the proffered reason is pretextual. See Stewart, 207 F.3d at 376; Herron v. DaimlerChrysler Corp., 388 F.3d 293, 301 (7th Cir. 2004). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Stewart, 207 F.3d at 378 (quoting Jackson v. E.J. Brach Corp., 176 F.3d 971, 983 (7th Cir. 1999)). The court will not "sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." Id. Moreover, it is not sufficient to prove that the reason was doubtful or mistaken. Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 541 (7th Cir. 1998). Pretext does not mean simply a mistake, but

instead a lie, "specifically a phony reason for some action." Id. (quoting Johnson v. City of Fort Wayne, 91 F.3d 922, 931 (7th Cir. 1996)). The only concern is whether the legitimate reason provided by the employer is in fact an honest one. See Stewart, 207 F.3d at 378.

Carver presents no evidence that suggests DOT's proffered reasons for not hiring him are a lie. Cound and Brand, who were in charge of hiring at Chicago Center in 2002, have stated that applicants from the VRA, MARC, and CTI pools demonstrated stronger ability, and higher success rate than those from the ex-PATCO pool. In fact, in 2002, Chicago Center officials did not even request a PATCO referral list. Therefore, neither Cound nor Brand could have known that Carver was eligible for employment, because his name never appeared on any list of possible applicants. As a result, Carver cannot claim that the DOT discriminated against him in 2002, because he was never considered for the position in the first place. The court will not re-examine the DOT's hiring practices, or second guess its business judgment. See Stewart, 207 F.3d at 378. Consequently, there is no evidence to suggest that the DOT's reason for hiring the more qualified and experienced air traffic controller applicants was "specifically a phony reason for some action." Crim, 147 F.3d at 541.

Therefore, upon review of the McDonnell Douglas burden shifting method, summary judgment is proper in favor of the DOT as to Carver's gender discrimination claim.

### D. Carver's Age Discrimination Claim

*1. Carver has not established a prima facie case of age discrimination*

Carver has provided no documents, statements, or other materials that would give rise to any direct evidence of age discrimination. See Walker, 410 F.3d at 394; Raymond, 442 F.3d at 610. Therefore, he must proceed under the McDonnell Douglas burden shifting method.

14

In order to establish a prima facie case of age discrimination under Title VII, a "plaintiff must show that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably." Goodman v. Bd. of Trustees of Univ. of Ill., 442 F.3d 611, 617 (7th Cir. 2006); Bio, 424 F.3d at 596; Zaccagnini v. Charles Levy Circulating Co., 338 F.3d 672, 676 (7th Cir. 2003). The DOT agrees that Carter satisfies the first two elements of his prim facie claim, and concedes "for purposes of summary judgment only" that the DOT rejected Carver. See Def's Mot. for Summ. J., at 13. Therefore, the only dispute is whether similarly situated employees were treated more favorably than Carver.

### 2. *Similarly Situated Employees*

Carver cannot satisfy the similarly situated prong of the McDonnell Douglas test. A similarly situated employee "is one who is 'directly comparable to the plaintiff in all material aspects.'" Bio, 424 F.3d at 596 (quoting Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002)); see Goodwin, 442 F.3d at 618-19. To determine whether two employees are similarly situated, the court must "look at all relevant factors, including whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications– provided the employer considered these latter factors in making the personnel decision.'" Bio, 424 F.3d at 596 (quoting Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 532 (7th Cir. 2003)).

Carver does not point to any specific individuals that were hired instead of him. His allegations center around the fact that in 2002, the Chicago Center hired twenty-three air traffic controllers from the VRA, MARC, and CTI pools, instead of from the ex-PATCO applicant list.

15

Nowhere in Carver's pleadings does he name a single individual who could be described as "similarly situated."

Furthermore, the pool of applicants from the VRA, MARC, and CTI cannot be considered similarly situated as Carver. These applicants had extensive training with the military, as well as significant education in radar technology. Carver, on the other hand, admits to have worked as a handyman in Kentucky since 1981. In that time, he has had no air traffic control experience, or education on any of the new technology employed by controllers. Additionally, all of the controllers hired in 2002 were younger than Carver because starting in 1992, the FAA prohibited officials from hiring new controllers over the age of 30. Therefore, any ex-PATCO controller who had been fired in 1981 would necessarily be older than virtually all other applicants. Plainly put, Carver "fails to present *any* evidence that would allow a meaningful comparison" between Chicago Center's decision not to hire him, and the skills and qualifications possessed by those controllers who obtained employment in 2002. See Hull v. Stoughton Trailers, LLC, - - F.3d - - , 2006 WL 1084258 at *3 (7th Cir. Apr. 26, 2006). As a result, the court finds that Carver has not established the similarly situated prong of his prima facie case of age discrimination.

### 3. *Burden Shifting analysis*

The burden shifting analysis in age and gender discrimination claims are identical. See Goodman, 442 F.3d at 617; Gore, 416 F.3d at 592; Ballance, 424 F.3d at 617. Because the court has already engaged in a thorough analysis of the McDonnell Douglas analysis in Section II B, it need not do so again.

## III. CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

ENTER:

*[signature: Charles R. Norgle]*

CHARLES RONALD NORGLE, Judge

United States District Court

DATED: 5-5-06